IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD KIELBASA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )　No. 02 C 4233 |
| | )　Judge Joan H. Lefkow |
| ILLINOIS ENVIRONMENTAL | ) |
| PROTECTION AGENCY, and RENEE | ) |
| CIPRIANO, Individually and In Her Official | ) |
| Capacity as Director of the Illinois | ) |
| Environmental Protection Agency, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Richard Kielbasa ("Kielbasa"), brings this action against the Illinois

Environmental Protection Agency ("IEPA"), alleging failure to reasonably accommodate his

disability in violation of the Americans with Disabilities Act ("ADA"), 29 U.S.C. §§ 12101 *et*

*seq.*; 42 U.S.C. § 1983; and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §§ 701 *et seq.*

This court has jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), 42 U.S.C.

§ 12117(a), and 29 U.S.C. § 791. Before the court are cross-motions for summary judgment.

For the reasons set forth below, the court grants IEPA's motion for summary judgment and

denies Kielbasa's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

1

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). The mere filing of cross-motions for summary judgment does not establish that there is no genuine issue of material fact. *M. Snower & Co.* v. *United States*, 140 F.2d 367, 369-371 (7th Cir. 1944).

## FACTS

In 1986, Richard Kielbasa began what by all accounts has been a distinguished career as an employee with the IEPA. (Pl. L.R. 56.1 ¶ 5). Kielbasa began his career as a Vehicle Emissions Compliance Inspector ("VECI"). *Id.* at ¶ 7. In 1992, in recognition of his exemplary performance, Kielbasa was promoted to the supervisory position of Vehicle Emissions

2

Compliance Supervisor ("VECS"). *Id.* at ¶ 12. In that position, Kielbasa was generally responsible for supervising State inspectors at test facilities, reviewing the inspectors' paperwork, adjusting grievances and overseeing customer relations, as well as issuing evaluations of the test facilities' employees. *Id.* at ¶¶ 36-38.

The IEPA has issued a VECS position description, however, which exhaustively sets forth the "specific job requirements" for the VECS position, as well as the position's "duties and responsibilities." *Id.* at ¶ 38. The VECS position description does not specifically define which of the responsibilities of the VECS position are essential. *Id.* The VECS position description does state, however, that 20% of the position entails "operat[ing] a motor vehicle" and "travel[ing] between the vehicle emissions testing stations in the geographic sector and the Field Services Section headquarters to observe job performance of subordinates, pick-up and deliver materials and supplies such as statistical surveys compiled by subordinates, time cards, compliance postcards and office supplies." *Id.* In addition, the position description states that the position "[r]equires a valid drivers license and several hours of travel weekly." *Id.*

Within eight months of his promotion to VECS, Kielbasa, like his other VECS colleagues, was assigned a state vehicle to perform his duties. *Id.* at ¶ 81. On average, Kielbasa put approximately 1700 miles per month on his state vehicle, routinely spent at least 20% of his time traveling between his assigned test facilities and, on days when he was visiting test facilities, spent a couple of hours a day in the State vehicle. *Id.* at ¶ 114.

On or about October 1997, Kielbasa began noticing a deterioration in his peripheral vision. *Id.* at ¶ 92. Shortly thereafter, in November 1997, Kielbasa was diagnosed with a tumor on his optic chiasm. *Id.* at ¶ 99. Kielbasa immediately underwent surgery and began receiving

3

steroids in an attempt to regain his vision. *Id.* at ¶¶ 100, 102. Kielbasa initially experienced dramatic improvement. *Id.* at ¶ 103. In fact, by December 1997, Kielbasa's vision had sufficiently improved that he was able to personally operate his State vehicle and perform all of his VECS duties. *Id.* at ¶ 104. From December 1997 through June 1998, Kielbasa was able to drive himself 50% - 70% of the time to his assigned test facilities, while receiving rides from friends and family when his vision did not permit him to drive. *Id.*

By July 1998, however, Kielbasa's vision once again began to deteriorate, ultimately leaving him, irreparably, legally blind. *Id.* at ¶ 107. Kielbasa promptly notified his supervisor Ron Wohrle ("Wohrle") of the recurrence of his condition and requested permission to make alternative arrangements for traveling to and from his assigned test facilities. *Id.* at ¶¶ 109, 118-122. While their remains some disagreement as to who initially proposed the arrangement, Kielbasa and Wohrle ultimately agreed that Kielbasa would continue to receive rides from friends or family and when possible to travel with one of the Quality Assurance Auditors ("Auditors"), who themselves were assigned to his test facilities. *Id.* Wohrle then authorized Auditors Wes Streblo, Rich Barton, and Vince Parmigiani to give Kielbasa rides as needed. *Id.*

Then, in the Fall of 1999, Kielbasa and Wohrle again met to discuss Kielbasa's deteriorating eyesight and how Kielbasa would get to his assigned test facilities. Def. L.R. 56.1 ¶¶ 24-26. While it appears that Wohrle initially proposed that Kielbasa remain in a single IEPA office helping with technical and operational problems, Kielbasa expressed a strong desire to continue in his VECS position, and Wohrle ultimately relented. *Id.* Wohrle and Kielbasa agreed, as they had during their earlier meeting during the summer of 1998, that Kielbasa would arrange to travel with one Auditor each day and that Kielbasa would establish a schedule for the

4

Auditors so that they would know which day Kielbasa would ride with them. *Id.*

Thus, beginning in January 1999 and continuing until April 2000, Kielbasa received regular rides with Auditors to his assigned test facilities. *Id.* Around this same time, the IEPA also granted Kielbasa's formal request for reasonable accommodation for a large screen computer monitor with enhanced software, a close circuit television, and a portable close circuit televison. *Id.* at ¶ 20. As a result of the accommodations afforded Kielbasa by the IEPA, Kielbasa was able to successfully perform nearly all of his duties as a VECS. Pl. L.R. 56.1 ¶ 196. Indeed, in both 1999 and 2000, Kielbasa received the identical "Accomplished" rating on his performance evaluation that he had received in 1998 while still, at least on many occasions, driving himself to his assigned test facilities. *Id.* at ¶¶ 210-212.

On April 10, 2000, however, Lynda Martin ("Martin"), the EEO/AA/ADA Manager for the IEPA, informed Kielbasa that he could not continue as a VECS due to his inability to drive himself to his assigned test facilities. *Id.* at ¶ 165. Martin advised Kielbasa that the Auditors' driving of Kielbasa to test facilities when they were not going there for their own work-related reasons violated the IEPA's collective bargaining agreement governing the Agency's relationship with the Auditors, as well as the Auditors' job descriptions, and therefore the arrangement had to be terminated immediately. *Id.* at ¶¶ 165-167; Def. L.R. 56.1 ¶ 45. As a result, Kielbasa was reassigned to the Elk Grove Office of the IEPA, though he remained in rank and title a VECS. Def. L.R. 56.1 ¶ 47.

Soon thereafter, Kielbasa filed a grievance and requested that he be permitted to continue with the driving arrangement previously approved by Wohrle. *Id.* at ¶ 48. In the alternative, Kielbasa requested permanent assignment to an IEPA office near his home. *Id.* The IEPA

5

informed Kielbasa that if placed at a location near his home he would be unable to retain his VECS position but that a VECI position was open and available. *Id.* at ¶ 49. Kielbasa accepted the VECI position on a trial basis. *Id.* While Kielbasa performed well at that location and as a VECI, the compromise did not last. *Id.* at ¶

In a May 5, 2000 letter, Martin gave Kielbasa three options regarding his employment: (1) an Executive I position which kept Kielbasa at the same rate of pay and seniority as his former VECS position; (2) a VECI position at a permanent location, albeit with a lower salary than his VECS position or the offered Executive I position; or (3) a non-service connected leave of absence whereby Kielbasa would regularly receive money from the IEPA and have the ability to supplement that income with other employment. *Id.* at ¶¶ 55, 64, 67. Kielbasa opted for the Executive I position. *Id.* at ¶ 68.

Yet, after transferring to the Executive I position, Kielbasa again requested that the IEPA permit him to return to his VECS position with some form of accommodation. *Id.* at ¶ 70. The IEPA responded in a letter on June 9, 2000, stating that Kielbasa's grievance had been resolved when he agreed to take the Executive I position.

On October 3, 2000, Kielbasa filed a charge against the IEPA with the Equal Employment Opportunity Commission ("EEOC"). On June 29, 2001, the EEOC sent Kielbasa a letter stating that it had determined that the IEPA had failed to reasonably accommodate Kielbasa in violation of the ADA, and invited the parties to join with the EEOC in reaching a resolution of the matter through conciliation. The IEPA refused to participate in the conciliation process. On March 14, 2002, the EEOC sent a right-to-sue letter to Kielbasa and soon thereafter, on June 13, 2002, Kielbasa filed his Complaint in this court seeking injunctive relief and damages against the

6

IEPA.[1] Kielbasa alleges that the IEPA refused and failed to continue accommodating his disability, demoted him, and treated him in a manner "significantly different from and inferior" to the treatment of their similarly situated employees without visual impairments.

## DISCUSSION

To establish a claim of disability discrimination, Kielbasa must show that he is disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job with or without a reasonable accommodation, and that he suffered from an adverse employment action as a result of his disability. *Basith* v. *Cook County*, 241 F.3d 919, 927 (7th Cir. 2001).

An individual is "disabled" if he has (1) a physical or mental impairment that substantially limits him in one or more major life activities; (2) that he has a record of such an impairment; or (3) that the employer regarded him as having such an impairment. 29 U.S.C. § 706(8)(B); 42 U.S.C. §12102(2); 29 C.F.R. §§ 1613.702(a), 1630.2(g). Major life activities are defined as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §§ 1613.702(c), 1630.2(i). Not every impairment that affects an individual's major life activities is a substantially limiting impairment. *Hamm v. Runyon*, 51. F.3d 721, 724 (7th Cir. 1995). The term "substantially limits" means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population. *See* 29 C.F.R. § 1630.2(j)(1)(ii).

Here, the parties do not dispute that Kielbasa suffers from a vision impairment caused by

---

[1] Kielbasa also brought claims against the current director of the IEPA, Renee Cipriano, but the claims against Cipriano were dismissed pursuant to this court's February 28, 2003 Order. In addition, Kielbasa initially asked the court in his Complaint for punitive damages, but he has since withdrawn that request.

7

a combination of the tumor on his optic chiasm and the treatment thereof. Instead, the parties dispute whether that vision impairment substantially limits Kielbasa in the major life activity of seeing.

Kielbasa testified during his deposition that he is legally blind and that there is currently no medical treatment that might help him regain his eyesight. Kielbasa's testimony is supported by the objective assessment of his treating neuro-opthalmalogist, who found in June 1999 that Kielbasa's visual acuity in his right eye extended only to "counting fingers," while the visual acuity of his left eye is "20/200." The IEPA admits that Kielbasa's visual acuity in his left eye has deteriorated further to "20/400."

Thus, it appears incontestable that Kielbasa's eye disease is a substantial limitation on his ability to see. In *Albertson's v. Kirkinburg*, 527 U.S. 555, 559, 119 S.Ct. 2162, 2165 (1999), the Supreme Court found that an individual with 20/200 vision in his left eye had, in effect, monocular vision and stated that "people with monocular vision ordinarily will meet the Act's definition of disability." Accordingly, Kielbasa, whose visual acuity in *both* eyes is significantly worse than the visual acuity of the individual in *Kirkinburg*, is substantially limited.

Remarkably, however, the IEPA argues that Kielbasa's testimony and his neuro-opthalmalogist's report establishes only that his eye disease impairs his ability to drive and to read; not that it substantially limits his ability to see. In support of its argument, the IEPA submits a computer printout of an article from the Fall of 2002 newsletter of Kielbasa's counsel, Equip for Equality, which was posted on Equip for Equality's website. In that article, Kielbasa states that despite his vision impairment he continues to engage in such activities as fishing, collecting model trains, coaching football and basketball, performing repair projects around his

8

home, and helping his children get ready to attend school. But the IEPA itself acknowledges that the website article does not provide details on whether Kielbasa's participation in the aforementioned activities involves the use of sight. It is irrelevant whether Kielbasa remains capable of performing everyday life activities that, while indicative of a high functional capacity, are unrelated to the major life activity of seeing. The website article is strong proof that Kielbasa has demonstrated remarkable perseverance. It falls far short, however, of proof that he is not constantly confronted and limited by a severe disability. Thus, the IEPA fails to put forth evidence creating a genuine issue of material fact that Kielbasa is disabled from the major life activity of seeing.[2]

As stated previously, the second element Kielbasa must establish to succeed on an ADA claim is that he is qualified to perform the essential functions of the VECS position with or without a reasonable accommodation. 42 U.S.C. § 12111(9).

Whether Kielbasa meets the definition of a "qualified individual with a disability" involves a two-step determination. 29 C.F.R. app. § 1630.2(m). First, Kielbasa must establish that he possessed "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* If he does, Kielbasa must then show that he could "perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The determination as to whether Kielbasa is a "qualified individual with a disability" must be made as of the time of the employment decision.

_____

[2]Kielbasa moved to strike the Equip for Equality newsletter submitted by the IEPA in support of their Response to Plaintiff's Motion for Summary Judgment, arguing that it "is unsupported by authenticated or admissible evidence, and is also irrelevant, immaterial, and impertinent." It ultimately makes no difference whether the newsletter is stricken because it is irrelevant or admitted and disregarded for the same reason, because, in either case, the newsletter fails to raise an issue of material fact as to whether Kielbasa is disabled. Yet, for the record, Kielbasa's motion is denied as moot.

9

*Id.; see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996).

The IEPA argues that Kielbasa was not a "qualified individual with a disability" because (1) he lacked the prerequisite of a driver's license; (2) he was unable to perform an essential function of the VECS position; and (3) there was no reasonable accommodation that would permit him to perform the essential functions of the VECS position. Because the second argument is dispositive the court refrains from addressing the other two.

As to the dispositive argument, the IEPA contends that driving is an essential function of the VECS position. The IEPA argues that both the position description and the work experience of Kielbasa and other supervisors in the field confirm that driving is an essential function. Since Kielbasa is legally blind and unable to drive, the IEPA argues that he is unable to perform all of the essential functions of the VECS position. In response, Kielbasa argues that driving is a marginal function of the VECS position as evidenced by the fact that Kielbasa received positive performance evaluations without driving and driving is not specifically evaluated on any of the job performance evaluations.

The "essential functions" are the fundamental job duties of the employment position; the term does not include marginal functions. 29 C.F.R. § 1630.2(n). Evidence of whether a particular function is essential includes, among other things, the employer's judgment on the matter and written job descriptions for the job, 42 U.S.C. § 12111(8), the amount of time spent performing the function, the consequences of not requiring the person to perform the function, the terms of a collective bargaining agreement, the work experience of others in the job, and the work experience of the incumbent. 29 C.F.R. § 1630.2(n)(3); 259 F.3d 610, 615 (7th Cir. 2001).

The IEPA did not specifically delineate the "essential functions" of a VECS. It did,

10

however, issue a written VECS job description. And "written job descriptions are clearly instances of the employer's judgment as to which functions are essential." *Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir. 2001). Moreover, "although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *Id.* (citations omitted). The VECS position description states that 20% of the position involves "operat[ing] a motor vehicle" and "travel[ing] between the vehicle emissions testing stations in the geographic sector and the Field Services Section headquarters to observe job performance of subordinates, pick-up and deliver materials and supplies such as statistical surveys compiled by subordinates, time cards, compliance postcards and office supplies." (Pl. L.R. 56.1 ¶ 38).

Kielbasa does not dispute that 20% of the position involves traveling by automobile. But he argues that "operat[ing] a motor vehicle" and "travel[ing] between the vehicle emissions testing stations" are in fact separate and distinct functions of a VECS and though the latter may be essential, the former is not. While perhaps conceptually correct, Kielbasa's argument is ultimately unpersuasive. In short, although driving is not the purpose of the VECS position, the record leaves no doubt that the job cannot be done without driving. As such, driving is essential.

Admittedly, driving is not, in general, the quintessential function of a VECS as it is for interstate commercial truck drivers and bus drivers. *See Albertson's Inc.*, 527 U.S. 555, 579, 119 S.Ct. 2162, 2175 (stating "[t]he quintessential function of that job, it seems to me, is to be able to drive a commercial truck in interstate commerce....") (Thomas, J., concurring); *see also Green v. Pace Suburban Bus*, 2004 WL 1574246, *6 (N.D. Ill. 2004); *Thoms v. ABF Freight System, Inc.*,

11

31 F.Supp.2d 1119, 1126 (1998). But, with respect to the aforementioned 20% of the position, driving, as it is for commercial truck drivers who pick-up and deliver goods and bus drivers who pick-up and deliver passengers, is the quintessential function of a VECS who picks-up and delivers materials and supplies to subordinates at his assigned test facilities. It is thus reasonable to conclude, on the basis of the position description alone, that driving comprises 20% of the duties of a VECS, constitutes the second largest duty of a VECS, and was regarded as an essential function by the IEPA.

The record, however, contains considerably more evidence to support these conclusions. The IEPA, for instance, further expressed its judgment that driving is an essential function by requiring a "valid driver's license" as a prerequisite for the position and by providing state vehicles to all VECS employees. Thus, irrespective of the position description, the IEPA has made clear by both word and deed that it deems driving to be an essential function. And indeed, the experience of Kielbasa and other VECS employees confirms that it is. Kielbasa admits that he routinely drove approximately 1700 miles a month and that on many days he spent "a couple of hours a day" in the car. Likewise, Chuck Hesemann, a retired VECS, estimates that he spent 50% of the day in his state vehicle on the days he visited his assigned test facilities.[3] Thus, the IEPA puts forth persuasive evidence that driving is an essential function.

In contrast, Kielbasa presents no evidence that conflicts with the essential job functions as defined by the IEPA. Kielbasa argues that driving is non-essential because it is not specifically

---

[3] In Response to Defendant's Rule 56.1 Statement of Material Facts, Kielbasa states only that it "should not have taken 50% of the day to drive between test stations." This statement, based solely on Kielbasa's affidavit, is insufficient to rebut Hesemann's sworn testimony that it did in fact take him 50% of the day. Thus, the court disregards Kielbasa's denial and deems admitted the fact that it took Hesemann 50% of the day to travel between his assigned test facilities. Fed.R.Civ.P 56, 28 U.S.C.A.; U.S. Dist. Ct. Rules N.D. Ill., General Rule 56.1.

12

evaluated in a separate category on the performance evaluation worksheet. But driving is an essential function of Kielbasa's position not only because it is an independent duty of a VECS, but also because it is a constitutive part of most other duties of a VECS. The performance evaluation worksheet simply, though implicitly, acknowledges the interrelation between driving and the other duties of a VECS by incorporating the evaluation of a VECS employee's operation of a motor vehicle with an evaluation of their performance of their other duties. For instance, Kielbasa's 1999 performance evaluation states in the review of his "planning" abilities that "Rich's planning abilities are affected by his inability to drive. He relies on others to get him to and from work and the test stations, and his plans are subject to the availability and plans of his drivers. However, a situation has not arisen where Rich was unable to get the job done due to this situation." Similarly, Kielbasa's ability to drive can also be easily evaluated as part of the appraisal of his fulfillment of the objective of "visit[ing] test stations as necessary." Thus, since the performance evaluation worksheet provides ample opportunity to evaluate a VECS employee's ability to drive, there is no basis to infer that driving is a non-essential function.

Likewise, the conclusion that driving is an essential function of a VECS is not altered by the fact that Kielbasa received positive performance evaluations during the period of time the IEPA reallocated to state Auditors and allowed Kielbasa's friends and family the task of driving Kielbasa to his assigned test stations. The mere fact that the IEPA temporarily exempted Kielbasa from driving and evaluated him solely on the performance of his other duties does not show that driving is non-essential. Absent independent evidence that driving was non-essential, it would be unfair to consider the IEPA's accommodation as proof that driving was not an essential function because it would punish the IEPA for going beyond what the ADA requires.

13

*See, e.g., Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001) ("The fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job.") (*citing Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997) ("Employers should not be discouraged from doing more than the ADA requires...."); *Vande Zande v. State of Wis. Dep't. of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("[I]f the employer ... bends over backwards to accommodate a disabled worker – goes further than the law requires ... it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.")); *see also Frix v. Florida Tile Indus., Inc.*, 970 F.Supp. 1027, 1035 (N.D. Ga. 1997) ("That an employer utilizes for several years an alternative method for the performance of certain tasks that a disabled employee cannot perform ... does not ... suggest that the task, itself, is not essential.") (citations omitted).

In light of all these factors, the evidence establishes that operating a motor vehicle to travel between assigned test facilities is an "essential function" of a VECS. And although an employer may be required to "restructure a job by reallocating or redistributing non-essential, marginal job functions... [a]n employer or other covered entity is not required to reallocate essential functions," such as the driving duties performed by a VECS. 29 C.F.R. Pt. 1630; App. § 1630.2(o)(1996); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112-13 (8th Cir. 1995); ("employer need not reallocate the essential functions of a job, which a qualified individual must perform"); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job.") Thus, since Kielbasa is unable to safely operate a motor vehicle and no reasonable accommodation would permit him to do so, Kielbasa is not a "qualified individual with a

14

disability" because he cannot perform all the essential functions of the position.

To hold otherwise would expand greatly the scope of the ADA and the Rehabilitation
Act. If the court were to find that driving is a marginal function of a VECS, then it would, for
instance, necessarily have to find that driving is a marginal function of the vast array of sales
positions in which employees are chiefly responsible for selling a given product but must spend
considerable time in a car to do so. The court does not believe, and Kielbasa has cited no
authority to suggest, that Congress ever intended such a result.

Finally, Kielbasa alleges that the IEPA failed to engage in an interactive process
regarding possible accommodations of his transportation needs to perform his VECS duties.
Once Kielbasa communicated his disability to the IEPA and requested an accommodation, the
IEPA had an obligation to explore with Kielbasa the possibility of a reasonable accommodation.
*Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). But "the interactive process the ADA
foresees is not an end in itself; rather it is a means for determining what reasonable
accommodations are available to allow a disabled individual to perform the essential functions of
the position sought." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000) (*quoting
Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997). Thus, "failure to engage
in this interactive process cannot give rise to a claim of relief [] if the employer can show that no
reasonable accommodation was possible. *Hansen*, 233 F.3d at 521 (citations omitted). Here,
since there was no reasonable accommodation that would have enabled Kielbasa to perform the
essential function of driving, the alleged failure to engage in an interactive process is moot.[4]

---

[4]Kielbasa moved to strike the Affidavit of Jill Johnson and certain other exhibits that related to whether
Kielbasa's proposed accommodation was reasonable. Since the court grants the IEPA's motion for summary
judgment on other grounds, the court need not resolve the issues raised by Kielbasa's motions to strike.

## ORDER

For the reasons stated above, defendant's motion for summary judgment (#63) is granted.

Plaintiff's motion for summary judgment (#66) is denied. Plaintiff's motion to strike Jill

Johnson's Affidavit (#70) and defendant's exhibits and unsupported claims (#95) is denied as

moot.

Dated: November 3, 2005        Enter:

JOAN HUMPHREY LEFKOW
United States District Judge

---

Accordingly, the court denies the motions as moot.